UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| G, a Minor, by WILLIAM B., Her Father and Natural Guardian, | \_\_\_\_ -cv- \_\_\_\_\_ |
| *Plaintiffs,* | |
| *-v.-* | **COMPLAINT** |
| THE COHEN CAMPS, CAMP PEMBROKE d/b/a THE ELI AND BESSIE COHEN CAMPS OF MASSACHUSETTS, INC., AMY CORAN, and BECCA GOLDMAN, | JURY TRIAL DEMANDED |
| *Defendants.* | |

Plaintiff G, a minor, by WILLIAM B., her father and natural guardian, by and through their counsel, ColeMyers, PLLC, as and for a Complaint against THE COHEN CAMPS, CAMP PEMBROKE d/b/a THE ELI AND BESSIE COHEN CAMPS OF MASSACHUSETTS ("Camp Pembroke"), AMY CORAN, and BECCA GOLDMAN (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

Plaintiff G, a 12-year-old minor suing by a fictitious name for privacy reasons, and G's parent and natural guardian, William B., bring this action to redress the severe and emotional damage, suffering, and trauma caused by Defendants' willful acts of defamation, gross negligence, intentional infliction of emotional distress, and breach of contract.

## PARTIES

1.      Plaintiff G is a twelve-year-old minor, represented by her father and natural guardian, William B., and is a resident of the State of New York.  G commences this action under a fictitious name to protect her privacy.

2.      Plaintiff William B. is a resident of the State of New York, and the father and natural guardian of G.  Plaintiff William B. commences this action on behalf of G, his minor child.

3.      Defendant The Cohen Camps, doing business as the Eli and Bessie Cohen Camps, maintains its offices in Wellesley, Massachusetts, and operates three summer camps—Camp Pembroke, Camp Tel Noar, and Camp Tevya—located in Massachusetts and New Hampshire for the benefit of children with a mission to enrich Jewish values, learning, and traditions for its attendees.

4.      Defendant Camp Pembroke, a not-for-profit corporation doing business as The Eli and Bessie Cohen Camps of Massachusetts, Inc., operates an all-girls camp located in Pembroke, Massachusetts, formerly attended by G.

5.      Defendant Amy Coran is the Co-Director of Camp Pembroke and, upon information and belief, a resident of the State of Massachusetts.

6.      Defendant Becca Goldman is the Co-Director of Camp Pembroke and, upon information and belief, a resident of the State of Massachusetts.

**JURISDICTION**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000 and the parties are citizens of different States.

8.      Venue in this judicial district is appropriate pursuant to 28 U.S.C. § 1391(b) and because the parties, pursuant to their contract, designated the State of New Hampshire as the venue for controversies arising therefrom.

## FACTS COMMON TO ALL CLAIMS

9.     G is twelve years old.  Beginning with the summer season in 2021, she attended an all-girls camp in Pembroke, Massachusetts, run by The Cohen Camps, called Camp Pembroke.

10.     Camp Pembroke, like the other camps run by The Cohen Camps, advertises that it prides itself on instilling in its attendees core Jewish values and traditions.

11.     While attending Camp Pembroke in 2021, G made numerous friends and enjoyed her summer engaging in traditional camp activities. She had no disciplinary issues.

12.     The following year, G again applied to and was accepted to return to Camp Pembroke for the summer.  G's parents completed the necessary paperwork, signed the applicable agreements, and paid the $10,750 tuition in full.

13.     As part of the application process, G and her parents reviewed and agreed to the terms of Camp Pembroke's "Camper Contract" as well as the guidelines set forth in the Camp's "Family Handbook" among other agreements and memoranda of understanding.

14.     In addition, The Cohen Camps published a "Bullying and Harassment Prevention and Intervention Plan" (the "Plan") which states that the mission of The Cohen Camps is to "enrich children's lives by encouraging Jewish youth to be comfortable and confident in themselves so that they can connect positively with others and the world in which they live."

15.     In accordance with that mission, the Plan sets forth prohibitions against certain improper conduct, and a detailed, multi-page procedure for how the Camp is required to address allegations of violations of the policy. This includes providing constructive warnings to campers who have allegedly done something wrong, making certain mandatory reporting within the Camp of violations of its policies, initiating a prompt investigation by the Defendants and other

3

Camp staff of reports—including interviews of those involved and witnesses—and generating and implementing a response plan to "ensure [an understanding of] behavioral expectations at the Cohen Camps *and to work toward a positive group dynamic*."

16.     G returned to Camp Pembroke on June 29, 2022, happy to see her friends.

17.     G enjoyed camp activities as she previously had, for the first seven days of camp, until July 6, 2022.

18.     On that day, the Camp's nurse and one of its directors, Defendant Coran, spoke to G about a complaint supposedly made by another 12-year-old, herein named "C", that G had purportedly touched C's breast (or breast area) when G had hugged C upon C's return to Camp.[1] In addition, the Nurse and Director asked G whether she was part of a group of campers that had, on occasion, engaged in typical horseplay in their bunks.  (This group did not include C.)  The Director and the Nurse did not discuss with G  any alleged participation in "inappropriate conversation" or with whom any such conversation may have taken place.

19.     The next day, without providing any warning to either G or her parents, the Defendants expelled G.  The Camp contacted G's parents, who were told in a phone call that the Defendants were expelling their child from the Camp.  The call focused on the need to pick up G immediately and characterized her behavior as inappropriate in conclusory, non-descriptive terms.  The Camp did not meaningfully describe what G actually did.

20.     That same day, as demanded (and without any practical choice), G's parents travelled from New York City to retrieve their child from the Camp.  Prior to her parents' arrival

---

[1]  C's mother, who for purposes of this Complaint shall be referred to as "D", is a senior staff member of Camp Pembroke.

at the Camp, G had no access to her parents or any form of support once members of the Camp staff began to set in motion her expulsion.

21.     G has denied the wrongdoing about which the Nurse and the Director spoke with her.  While she admitted then and admits now that she hugged C, she denies that she touched C's breast area while hugging her and emphatically denies that if, as C claims, she did so, that it was in any way intended to be "inappropriate physical contact" or the sort of "sexual harassment" or "physical sexual behavior" that the Camp's rules prohibit.

22.     Obviously, it is difficult to conceive how one 12-year-old girl can improperly touch the breast area of another 12-year-old girl while hugging her.  It is worth emphasizing that the "hug" at issue was between two 12 year old's upon C's return to Camp after a difficult procedure C had undergone for kidney stones.  The hug took place in the girls' bunk in front of several other persons.  It was an empathetic hug, reflective of what C had suffered through and welcoming her return to the Camp.  (It certainly was not part of an effort by G to harass C or initiate some form of sexual misconduct.).  In short, the hug was not the sort of conduct that was intended to or could have rationally been interpreted as the sort of conduct that could have triggered any of the prohibitions in the Camp's detailed Plan.

23.     In any event, common sense indicates that distinguishing between "proper" and "improper" hugs between 12 year old's is a challenging, if not impossible, task.  Hugs, by nature, even between consenting adults, are very "subjective."  One person's caring hug can be too forceful for the other.  Drawing the distinction between an "OK 12 year old's hug" and a "not OK 12 year old's hug" is obviously a difficult endeavor.  To find one such hug, accepting C's concerns as true, to be the grounds to expel the 12-year-old hugger – G – from Camp, is nothing short of irrational.

24.     The Camp's Plan understandably does not specifically address "hugging" in any way, nor, of course, are the 12 year old campers trained as to how to properly hug.

25.     Notably, the Camp, in fact, encourages hugging.  The Camp's website begins with the following:

> Welcome to New England's pluralist Jewish summer camp just for Girls. Meet your summer sisters and discover:  Amazing summers.  Lifetime friendships.  Your special place to cheer, ***hug***, laugh and grow into what you want to be.

26.     It is also worth noting that prior to G's expulsion, C, who had great difficulty socializing with the other campers, left Camp before G's parents were instructed to pick G up from Camp.

27.     After the Defendants abruptly (and callously) expelled G from the Camp, the Defendants Amy Coran and Becca Goldman made—individually, and on behalf of Defendants The Cohen Camps and Camp Pembroke—false and misleading statements to numerous parents of other campers, most significantly that G had engaged in "inappropriate physical contact" and "inappropriate conversation" with other campers her age.  The Defendants also falsely and misleadingly informed by an email to the Camp Community (the "Alert") that G was expelled because her conduct was a "violation of the camper contract and not in line with her community values" and that her conduct, which Defendants did not describe other than in conclusory fashion in their Alert, ***required*** the camper, G, to be removed from the Camp – in essence, that the Camp and the Defendants had no alternative course of action.

28.     These statements were knowingly false.  Their falsity was magnified by (i) the terms chosen by the Defendants to describe G's alleged conduct, namely, "inappropriate physical contact" and "inappropriate conversation"; (ii) the fact that the Defendants told the parents that they were compelled to expel G for such purported conduct (and that no other remedy would

6

have been sufficient); (iii) that G needed to be removed to protect the "safety and security of [the Camp's] campers *and staff"* (emphasis added); and (iv) that G's misconduct rose to the level that the Defendants were required by law to make a mandatory – that is, non-discretionary – report and that the Defendants did, in fact, report G's conduct to the Massachusetts Department of Children and Families ("DCF").  The Defendant's statements to the other campers' parents are fundamentally at odds with the actual accusations made by the Defendants to G's parents regarding G and inconsistent with the true facts.

29.     It is worth focusing on item (iii) above, "that G needed to be removed to protect the 'safety and security of our campers *and staff.*' "  Really?  Even accepting the Defendants' allegations as true, the notion that G needed to be expelled to protect *the staff* from improper hugging (or use of inappropriate language) by a 12 year old is a remarkable statement of "fact" for Defendants to make about G to the Camp community. The Defendants' claimed perception that G posed a threat to the staff: (i) is false; and (ii) underscores just how out of touch with reality the Defendants and the Camp's staff must be.  Clearly, accepting the allegations, *arguendo*, as true, the staff should not have feared G.  Rather, in accordance with expectations of any Camp's handling of 12-year-old's and consistent with the requirements of the Camp's own Plan, the Defendants and the Camp's staff should have engaged G and worked with her to address the allegations and help her have a rewarding summer as promised in the Camp's contract and advertised in its website.

30.     To that end, the Camp's contract and the five page "Cohen Camps Bullying and Harassment Prevention and Intervention Plan," (as previously defined, the "Plan")[2] require the

---

[2] As discussed further below, after expelling G, the Camp refused to talk to her parents or to provide any current Camp guidelines and/or rules.  The edition of the Cohen Camps Bullying

Camp, among numerous steps to address any problematic conduct, "to promptly investigate all reports and interview those involved … and to make a determination of bullying or harassment based upon all of the facts and circumstances."  The Plan sets forth in painstaking detail how counsellors and staff need to develop a written response plan to "address the situation" and "to work toward a positive group dynamic."  The Plan lays out in detail the efforts the Defendants, the supervising counsellors, and the senior staff are required to develop a "response plan" "includ[ing] the teaching of appropriate behavior by the camper whose conduct is perceived to be problematic."  Of course, implicit in any such Plan is that the Defendants and the Camp's staff will use common sense and decent judgment – and bear in mind the age of the camper who has allegedly strayed from the rules.

31.     The Defendants failed to make a serious effort to comply with the Camp's own rules.  The Defendants, despite multiple requests by G's parents and their counsel, have refused to describe any investigation they may have made, or what, if anything they did to work with G to help her address her perceived shortcomings.  They have shared no substantive facts and refused to explain in any detail how the decision was made to expel G.  Based on the little that the Defendants told the Bermonts, information obtained from other campers' parents, and other sources, the Bermonts are aware of the following:

- That another camper, "C," had complained about the way G had hugged her.  G hugged C in their bunk with other persons present.  The occasion for the hug was that C had just returned to Camp from having her kidney stones removed.

---

and Harassment Prevention and Intervention Plan cited is available on the Internet and is for the year 2016.

- That the only discussion the Defendants and Camp staff had with G about their concerns was a short conversation that the Camp's nurse and a director had with G the day before the Camp demanded that she be picked up.

- That admittedly, the Defendants had made no effort to help G address her perceived shortcomings. Nothing.

- And the Camp failed to disclose to G's parents that C was in the process of leaving Camp before G's conversation with the Camp director and nurse and, in fact, C left Camp before G was expelled.

Again, the Defendants told G's parents nothing further about the "allegation," or any possible efforts by the Defendants to productively work with G in accordance with the requirements of the Plan, to help her address her perceived behavioral issues.

32.     In short, the Defendants failed to follow their own Plan, expelled G from the Camp, and then misled and stonewalled her parents.

33.     A day later, the Defendants wrote to the Camp community as described above – namely that G posed a danger to the safety and security of both campers and the Camp's staff.

34.     Further, in that same Alert to the Camp community describing G's expulsion in terms that made her appear to be extremely dangerous (despite not stating a single fact about her alleged misconduct), the Defendants also set forth in detail how the Defendants were comprehensively addressing the substantial alleged damage G had caused the campers and the entire Camp community.

35.     Among other things, the Defendants told parents that they had spoken  to every camper in "the bunks within [G's] age group" about G's alleged conduct – even those who knew nothing about it.  According to the Alert, every camper in that age group had been "given trusted

9

adults to speak with," and the Alert went so far as to emphasize to parents that "our Wellness Team is a fantastic resource and *continues to be available to any camper*."

36.    In contrast, the Camp's Wellness Team never spoke to or made any effort to support G while she was a camper, during the day-long "expulsion process," when she was picked up by her parents, or after she had arrived home.

37.    In fact, the Camp has steadfastly refused to provide G's parents the information they need to try to explain to G why she was expelled, and to the extent any of the allegations have a grain of truth, to help her address any issues going forward.  Nothing.  No support from the Wellness Team, no help or even the disclosure of basic information to G's parents to compensate for the Camp's woeful lack of support.

38.    Obviously, the Camp's robust program of assistance to the other campers – and the Camp's touting of the need for it and its provision -- served to underscore and magnify the perception to campers and their parents that G's alleged misconduct was egregious and created a dangerous environment at the Camp.

39.    Finally, nowhere in the Camp's Alert to the parents and the Camp community did the word "allege" or any similar word modify the Alert's definitive, unqualified statement that G had engaged in "inappropriate conversation" and "inappropriate physical contact with other campers."  The Alert stated those conclusions as incontestable, determined "facts" (despite describing neither the purported conversation nor contact).

40.    Unsurprisingly, the parents of other campers have contacted G's parents.  Without exception, they have begun their conversations with expressions of concern about what the Camp described as G's misconduct – despite their familiarity with G, and their prior view that G is not a threatening, abusive 12-year-old that has the capability to cause the Camp's staff to fear for

10

their safety.  The starting point for every conversation has been the Camp's definitive description of G's serious transgressions.

41.     In addition to stonewalling G's parents' efforts to learn the facts or understand how the Camp determined them, the Defendants have refused to discuss with G's parents their request that the Defendants issue a statement to the other campers' parents making clear that the Alert sets forth allegations, that G denies them, and clarifying that G was expelled based solely on allegations.

42.     G's parents and then their counsel requested from the Defendants and the Camp's counsel the information the Defendants orally conveyed to the DCF, the required written report that followed the oral report, the name of the person to whom it was conveyed, and the current "governing documents" including the 2022 version of the Plan.  The Defendants and their counsel, Dona Feeney, refused to provide any of the requested information or documents.  With respect to the written report to the DCF, Ms. Feeney insisted that none had been made or would be made.

43.     Defendants' counsel have learned from DCF's counsel that a written report was, indeed, made by Defendants.

44.     To date, G's parents have not received the written report or any description of what the Defendants told DCF about their 12-year-old daughter.

45.     The Defendants, by summarily expelling G in such a cruel manner, without conducting an adequate investigation into the allegations against her, or attempting to use less punitive and more productive and supportive means to address her perceived misconduct, breached the express and implied terms of their agreement with G and her parents.  In so doing, they seriously harmed G and her parents.

11

46.     G and her parents now know "she has a record" with the DCF and that the ramifications of such a record going forward are serious.  In addition, G understandably fears almost certainly being tortured on social media as soon as the campers receive their phones back when they leave Camp.

47.     Defendants' false statements and malicious acts have caused, and continue to cause, G severe reputational and emotional harm.  G's parents have also suffered emotional, reputational and economic loss as a direct result of Defendants' unlawful conduct.

48.     Despite expelling G only a few days into the camp season, Defendants also refuse to refund G's parents any of the $10,750 in tuition G's parents paid in advance of the camp season.

## FIRST CLAIM FOR RELIEF
### (Defamation)

49.     Plaintiffs repeat and reallege paragraphs "1" through "48" as if fully set forth herein.

50.     Defendants maliciously and knowingly defamed Plaintiff G when, through its Co-Directors and Defendants Coran and Goldman, acting individually and on behalf of the Defendants The Cohen Camps and Camp Pembroke, they published statements about Plaintiff G which were false and caused substantial harm to her emotionally and to her reputation.

51.     Specifically, Defendants Coran and Goldman published an email to the parents of campers who attended Camp Pembroke with Plaintiff G and, in doing so, made a series of false statements of fact. Particularly, Defendants stated that Plaintiff G had engaged in "inappropriate physical contact" and "inappropriate conversation."  They failed to inform the parents that Plaintiff G had denied the allegations nor did Defendants apprise the parents that the statements about Plaintiff G were allegations. In addition, Defendants stated falsely that Plaintiff G had

posed a threat to the "safety and security of [the Camp's] campers *and staff,"* and that the conduct alleged to have been engaged in by Plaintiff G rose to the level of mandatory reporting.

52.     The foregoing statements were knowingly false when made by Defendants.

53.     The statements directly impugned and maligned the reputation and standing of Plaintiff G among her peers and in the community.

54.     As a result of those statements having been made and published to the parents of other campers, Plaintiff G's reputation has been harmed. In addition, Plaintiff G and Plaintiff William B. (as well as G's mother) have suffered severe emotional distress.

55.     As a result of the foregoing, Plaintiff G has been damaged in an amount to be determined at trial, but not less than One Million Dollars ($1,000,000.00).

## SECOND CLAIM FOR RELIEF
### (Gross Negligence)

56.     Plaintiffs repeat and reallege paragraphs "1" through "55" as if fully set forth herein.

57.     Defendants had a duty to protect the well-being and reputation of Plaintiff G from actual harm by reason of their relationship to Plaintiff G as a camper entrusted to Defendants' care.

58.     Defendants breached their duty to Plaintiff G when they expelled her from Camp Pembroke abruptly, without justification, and published statements against her which were false.

59.     As a direct and proximate result of the foregoing breach, Defendants have caused severe damage to Plaintiff G, both emotionally and as to her reputation, in an amount to be determined at trial but not less than One Million Dollars ($1,000,000.00).

## THIRD CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

60.     Plaintiffs repeat and reallege paragraphs "1" through "59" as if fully set forth herein.

61.     Defendants intentionally caused severe harm to the emotional well-being of Plaintiff G when they took the egregious and callous step of expelling her from Camp Pembroke based on mere allegations, and then published false statements, purporting to be actual "facts," that Plaintiff G had engaged in "inappropriate physical contact" and "inappropriate conversation" as well as labelling Plaintiff G a threat to the safety and security of her former fellow campers and the Camp's staff.

62.     The false statement asserting claims against a 12-year-old of "inappropriate physical contact" and "inappropriate conversation" as well as labelling her as a threat to the safety and security of her former fellow campers and the Camp's staff, is outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.

63.     As a direct and proximate result of the foregoing conduct, Defendants have caused severe damage to Plaintiff G and her parents, both emotionally and as to her reputation, in an amount to be determined at trial but not less than One Million Dollars ($1,000,000.00).

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract)**

64.     Plaintiffs repeat and reallege paragraphs "1" through "63" as if fully set forth herein.

65.     Defendants The Cohen Camps and Camp Pembroke entered into agreements with Plaintiff William B., as the parent and natural guardian of Plaintiff G., including the Camp's Contract and the incorporated Plan, which themselves incorporate  various other policies including the Handbook, all of which constitute a single agreement with Plaintiff concerning the terms and conditions of Plaintiff G's enrollment and attendance at Camp Pembroke.

14

66.     Plaintiff William B, and by extension Plaintiff G, performed their obligations under the contract—to wit, Plaintiff William B paid $10,750.00 representing the full tuition for the 2022 summer season.

67.     In breach of the parties' agreement, however, Defendants expelled Plaintiff G from the Camp without justification and failed and refused to return any or all of the tuition paid. In further breach of the parties' agreement, specifically under the Plan, Defendants failed and refused to engage in the process required by the Plan for investigating and counseling campers for alleged violations of the policies set forth in the Plan and Camp's Contract.  Specifically, Defendants failed to meaningfully intervention and investigate Plaintiff G' alleged violation of the Camp's policies.  In plain language, they did nothing to try to help G and enable her to complete the camp term.

68.     As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than Ten Thousand Seven Hundred and Fifty Dollars ($10,750.00).

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief and judgment in favor of Plaintiffs and against the Defendants:

(i)     On the First Claim for Relief, for damages to be determined by the Court, but not less than One Million Dollars ($1,000,000.00);

(ii)    On the Second Claim for Relief, for damages to be determined by the Court, but not less than One Million Dollars ($1,000,000.00);

(iii)   On the Third Claim for Relief, for damages to be determined by the Court, but not less than One Million Dollars ($1,000,000.00);

15

(iv)    On the Fourth Claim for Relief, for damages to be determined by the Court, but not less than Ten Thousand Seven Hundred and Fifty Dollars ($10,750.00);

(v)    Requiring the Defendants to issue a corrected "Alert" to the Camp community reflecting the true facts;

(vi)    Requiring the Defendants to withdraw the notice filed with the DCF and to confirm in writing that G has no "record";

(vii)    Awarding Plaintiffs such other, further and additional relief as the Court may deem just and proper, including reasonable attorneys' fees, interest and the costs and disbursements of this action.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial of all issues so triable in this action.

Dated:    Lebanon, New Hampshire
    July 26, 2022

COLEMYERS, PLLC

By:     /s/ Carolyn K. Cole
    Carolyn Cole, NH Bar # 14549
    18 Bank Street
    Lebanon, New Hampshire 03766
    (603) 678-8070

*Attorneys for Plaintiffs*

McLAUGHLIN & STERN, LLP

By:     /s/ Andrew E. Tomback
    Andrew E. Tomback
    Jonathan R. Jeremias
    260 Madison Avenue
    New York, New York 10016
    (212) 448-1100

*Attorneys for Plaintiffs,*
*Pro Hac Vice* (Pending)

16